UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

CARMEN BULA,

                                          Plaintiff,

          v.                                                              6:06-CV-1325
                                                                          (GLS/GJD)
COMMISSIONER OF SOCIAL SECURITY,

                                          Defendant.

_____

LOUISE MARIE TARANTINO, ESQ., for Plaintiff
SUSAN J. REISS, Special Asst. U.S. Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on May 4, 2004, alleging disability beginning March 30, 2001. (Administrative Transcript ("T."), 117-24).  The application was denied initially on December 6, 2004, (T. 52-66), and on reconsideration on February 22, 2005, (T. 68-78).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). When plaintiff filed her application for benefits during 2004, she lived in Puerto Rico and was represented by a private attorney. (T. 67, 79).  When plaintiff's case was scheduled for a hearing in late 2005, she had moved to Utica, New York, and her prior counsel in Puerto Rico had withdrawn his appearance. (T. 80, 97, 101).  The hearing was rescheduled and

ultimately held on March 22, 2006 in Utica, New York. (T. 35-49).  At the hearing, plaintiff appeared without counsel, and notwithstanding advice from the ALJ about plaintiff's right to have counsel present, plaintiff elected to go forward with the hearing *pro se*.  (T. 37).

On November 29, 2005, while plaintiff's disability insurance application was pending, she filed an application for Supplemental Security Income ("SSI") benefits (T. 469-72).  At plaintiff's March 22, 2006 hearing, the ALJ stated that she was going to consider both applications. (T. 37).  In a decision dated June 23, 2006, the ALJ found that plaintiff was not disabled. (T. 26-32).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on September 1, 2006.  (T. 5-7).

According to plaintiff's present counsel, plaintiff's request for SSI benefits was granted during March 2007, and plaintiff is presently receiving SSI benefits. (Dkt. No. 14, 3).  Her attorney states that the claim before this court is for "a closed period on the SSI claim from November 2005 to September 2006."  (Dkt. No. 14, 3).  Plaintiff is still pursuing her denial of Title II disability benefits, and since her last insured date is March 31, 2006, her attorneys concede that plaintiff must show a disability onset before March 31, 2006 to be successful on her Title II application.

## CONTENTIONS

Plaintiff makes the following claims in support of her position:

(1)    The ALJ failed to provide a full and fair hearing.

      (a) The waiver of plaintiff's right to counsel was insufficient. (Dkt. No. 14 at 19).

(b) The ALJ failed to fully develop the record. (Dkt. No. 14 at 20).
(c) The ALJ's credibility determination is erroneous. (Dkt. No. 14 at 22).
(d) The hearing transcript is incomplete. (Dkt. No. 14 at 23)

(2)     The ALJ's residual functional capacity assessment is erroneous. (Dkt. No. 14 at 24).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record and must be affirmed.

## FACTS

### 1.     <u>Non-Medical Evidence</u>

At the time of the ALJ hearing in 2006, plaintiff was 55 years old. (T. 39). Although plaintiff's work record is not totally clear because of the poor quality of the tape recording and transcript, plaintiff apparently worked in construction and other jobs during her work career. (T. 42-43).  Plaintiff's most recent work, however, was preparing food and doing kitchen work for a Head Start program in Puerto Rico.  (T. 42-43).  Plaintiff claims that she has difficulties with her hands, arm and her "nerves." (T. 43).  During her testimony, she stated that she was unable to lift, and had difficulty sitting and standing, therefore, she is no longer able to work. (T. 43-44).

### 2.     <u>Medical Evidence</u>

The record in this case contains extensive medical evidence.  Unfortunately, the evidence is somewhat confusing because many of plaintiff's medical records are in Spanish and had to be translated.  Thus, the administrative transcript in this case contains both the Spanish version of the medical reports and the English translation.[1]

---

[1] Occasionally, there are two English versions following the original Spanish document. This court will cite to the English translation of the medical reports.

Between 1999 and 2004, plaintiff was treated in Puerto Rico for costochondritis and hypothyroidism by Dr. Rafael Vasquez Perez.  Plaintiff visited Dr. Perez many times, and her treatment consisted of pain medication and thyroid supplements. (T. 309-41).

### A.    2001

In addition to visits to Dr. Perez during June 2001, an Evoked Potential Study of plaintiff's tibial nerves was performed. (T. 400-401).  The report showed abnormal findings, and it was suggested that plaintiff may have had a tibial nerve peripheral neuropathy. (T. 400-01).

### B.    2002 and 2003

During March and December 2002, plaintiff was examined for workers' compensation, apparently based on plaintiff's complaints that her medical problems, including diabetes, hypothyroidism, sprains of her feet, and back pain, were related to her work. (T. 374-81).  Examining physicians found that her leg pain was not related to any work events or conditions, but might be related to plaintiff's diabetes and hypothyroidism. (T. 377-81).  A March 8, 2002 medical report stated that plaintiff's diabetes "explains the existence of the peripheral neuropathy." (T. 377).

On December 12, 2002, Dr. Frank Benitez Rivera conducted a psychiatric examination of plaintiff to determine whether plaintiff's "emotional condition" was related to her work.[2] (T. 367-72).  Dr. Rivera states that a report by plaintiff's employer, dated September 12, 2000 stated that plaintiff had "problems with the

---

[2] The original report in Spanish appears on pages 363-64 of the administrative transcript. The report is followed by an incomplete English translation, and then a duplicate of the first page of the Spanish report. (T. 365-66).  Finally, it appears that the complete English translation appears at pages 367-72.  The court will cite to what appears to be the appropriate translation.

Warehouse Supervisor." (T. 368).  Dr. Rivera also referred to two previous

psychological evaluations, one by Dr. Félix Alamo, dated September 29, 2000, in

which Dr. Alamo diagnosed "mixed adjustment disorder." (T. 368).  Dr. Rivera also

referred to a January 29, 2001 report by Dr. Miguez, who also diagnosed mixed

adjustment disorder, "not related." (T. 368).

In his December 12, 2002 report, Dr. Rivera found that plaintiff was alert and

well oriented, with memory adequate in three spheres. (T. 371).  He also found that

her affect was "in consonance with her depressed demeanor; she had poor attention;

and poor ability to abstract. (T. 371).  She had poor judgment; poor ability to respond

to common daily life situations; and poor ability to anticipate the consequences of her

actions. (T. 372).  Dr. Rivera also found that she "lack[ed] introspection of her

emotional condition and diagnosed her with adjustment disorder with depression. (T.

372).

There is a brief mental status report in the record, dated September 19, 2003,

written by Dr. Cruz Mena. (T. 406).  Dr. Mena concluded that plaintiff should follow

up with group psychotherapy and take her medications as stated.  (T. 406).  On

November 26, 2003; January 21, 2004; and March 29, 2004, it appears that plaintiff

was examined by Nelda Mendez, M.D. (T. 407-12).  Dr. Mendez's reports are entitled

"Psychiatric Progress Note[s]." *Id.*  These are the follow-up psychotherapy to which

Dr. Mena referred since the November 26, 2003 note states that plaintiff was

"depressed in spite of the Zoloft that was prescribed by Dr. Cruz Mena."[3] (T. 411-12).

---

[3] Additionally, in a later report by psychiatrist Elvira Giambartolomei, she refers to
plaintiff "receiving psychiatric treatment through the "Health Reform" with Dr. Nida Mendez

Plaintiff had been prescribed a variety of medications for her condition. (T. 407, 411). The progress note dated January 21, 2004 states that plaintiff felt better, even though one of her medications was not approved. (T. 409-10).  On March 29, 2004, plaintiff told Dr. Mendez that she felt "depressed," and it appears that plaintiff's prescription for Prozac was "optimized." (T. 407-408).  All of the progress notes indicate that plaintiff was alert, oriented and logical. (T. 407, 407, 409, 411).  She was not suicidal, homicidal, nor did she have delusions or hallucinations. *Id.*

### C.    2004 and 2005

On January 16, 2004, plaintiff had a neurological examination in Puerto Rico by Dr. Manuel A. Martinez.  (T. 356-62).  Dr. Martinez's examination found some limitation in the "active movements of the neck." (T. 357).  He believed that plaintiff might have cervical spondyloarthritis and cervical myositis. (T. 357).  He also believed that plaintiff's muscle weakness and muscle stiffness might relate to a nerve issue, and recommended EMG testing. (T. 361).  He commented that over time, plaintiff had been diagnosed with various "clinical pictures," including carpal tunnel syndrome; C-6 radiculopathy; S-1 radiculopathy; and inflammatory problems of the right acromio-clavicular joint and shoulder. (T. 358).

At the request of the Social Security Administration, plaintiff had a psychiatric evaluation by Dr. Elvira Giambartolomei, a psychiatrist in Puerto Rico on July 15, 2004. (T. 417-21).  The report states that plaintiff's chief complaint was that she was "anxious." (T. 417).  Dr. Giambartolomei found that plaintiff's memory was impaired.

---

since September 2003 and up to present." (T. 418).  Dr. Giambartolomei states that plaintiff was seeing Dr. Mendez "every 30 days." *Id.*

Although plaintiff could perform simple calculations, plaintiff had psychomotor retardation, plaintiff was anxious, and her concentration was diminished. (T. 419-21). Dr. Giambartolomei found that plaintiff had a major recurring depression and assigned plaintiff a GAF[4] of 60.  (T. 421).

On August 11, 2004, plaintiff had a physical examination by internist, Dr. Frances Nazario. (T. 422-30).  Plaintiff was referred to Dr. Nazario by the "Disability Determination Program" for an "internal medicine evaluation." (T. 422).  Dr. Nazario found many normal results when examining plaintiff's range of motion (T. 428-30). Dr. Nazario concluded that plaintiff had degenerative joint disease in her lumbar spine and had moderate "physical disability" in lifting, carrying, pushing, and pulling because of plaintiff's limited range of motion from plaintiff's degenerative joint disease. (T. 426).  Dr. Nazario found a mild impairment in plaintiff's ability to stand, sit, bend, stoop, and kneel. (T. 426).

X-rays of plaintiff's lumbar spine and cervical spine were taken in conjunction with Dr. Nazario's examination.  (T. 431-32).  X-rays of plaintiff's lumbar spine showed normal lordosis, and normal vertebral body height and disc spaces. (T. 431). The doctor concluded that plaintiff had mild osteoarthritis of her lower lumbar spine. *Id.* The cervical spine x-ray also showed mild osteoarthritis with paraspinal muscle spasms. (T. 432).

On September 28, 2004, Dr. José R.Garcia and another non-examining

---

[4] GAF stands for Global Assessment of Functioning.

physician[5] reviewed plaintiff's medical records, and prepared a residual functional capacity ("RFC") assessment. (T. 436-43).  These physicians concluded that plaintiff could lift **fifty pounds** occasionally, twenty-five pounds frequently, stand about six hours, and sit about six hours in an eight hour work day, and that plaintiff had no restrictions on pushing or pulling.  (T. 437).

About two months later, on December 1, 2004, plaintiff's records were reviewed to prepare a mental RFC and a form entitled Psychiatric Review Technique. (T. 444-52).  The mental RFC assessment by Dr. Vecchini found that plaintiff had moderate restrictions regarding concentration and persistence. (T. 445-46).  Dr. Vecchini also found that plaintiff had some moderate limitations in the categories of understanding and memory; sustained concentration and persistence; and social interaction.  (T. 445-46).  The RFC also stated that plaintiff was moderately restricted in activities of daily living, social functioning, and maintaining concentration.  (T. 459).  On February 11, 2005, a non-examining psychologist reviewed the mental RFC prepared several months earlier, and agreed with the assessment of plaintiff's mental status.  (T. 464).

**D.    2005 and 2006**

Plaintiff's counsel has attached medical records for part of 2005 and 2006 to his brief.  They are not part of the administrative record,[6] but they document treatment by

---

[5] This physician's name is illegible. (T. 425, 443).

[6] Plaintiff's counsel states in a footnote that these are the records that the Commissioner should have obtained from plaintiff's physicians, and thus, they relate to the argument that the ALJ failed to properly develop the record.  However, counsel also argues that the records constitute "new and material" evidence under *Tirado v. Bowen*, 842 F.2d 595 (2d Cir. 1988).

Dr. Butala and Mental Health Connections in Utica, New York.  Dr. Butala's treatment started in August 2005, and continued through September 2006.[7]  On May 8, 2006, Dr.Butala prepared an assessment of plaintiff's ability to work for the New York State Division of Disability Determination. (Dkt. No. 14, attached pp. 57-58).  Dr. Butala found that plaintiff was very limited with respect to sitting, standing, lifting, pushing, and pulling, but found that these limitations would only exist for ninety (90) days.  (Dkt. No. 14, attached p. 58).

The records also contain copies of an MRI report and x-ray report from November 17, 2005.  The MRI found some moderate osteoarthritic changes in plaintiff's lumbar spine, and the x-ray found mild arthritic changes in plaintiff's cervical spine.  Also during May 2006, EMG and electro-diagnostic testing were performed, and all results were normal.  There was "no electrodiagnostic evidence of right carpal tunnel syndrome in plaintiff's hand." (Dkt. No. 14, attached p. 12).

Additional MRI exams were performed both in August 2006 and October 2006 on plaintiff's lumbar and cervical spine. (Dkt. No. 14, attached pp.13-14).  The lumbar MRI report states that plaintiff has *mild* annular disc bulging at L5/S1, and a very small central disc protrusion with no neurocompromise.  (Dkt. No. 14, attached p. 13).  The cervical MRI report found *mild* degenerative changes and a tiny disc protrusion at C4-5.  The report also shows a very mild posterior disc bulge at C5-6.  (Dkt. No. 14, attached p. 14).

Plaintiff attended physical therapy in mid-November, December 2006 and

---

[7] The plaintiff did not number the pages of the attached records, however, this court will refer to the pages as if they were numbered.  (Dkt. No. 14, attached pp. 1-9).

January 2007.  Plaintiff was treated for cervical and lumbosacral strains.  By December 23, her condition had improved, and by the end of January, she was "much improved," but still had minor limitations in her lumbar spine.  (Dkt. No. 14, attached pp. 16-18).

Plaintiff began treatment with psychologist Bonnie Melnick of Mental Health Connections in Utica, New York, in May 2006, and continued that treatment through late 2006.  (Dkt. No. 14, attached pp. 20-30).  Psychologist Melnick diagnosed plaintiff as having a major depressive disorder, and assigned a GAF of 60.  The notes from Mental Health Connections show that plaintiff's Prozac was discontinued, and she was started on two new medications, Lexipro and Lunesta. (Dkt. No. 14, attached p.21).  Treatment notes show that plaintiff was "much less depressed" with improved sleep and doing "much better."  The notes indicate that plaintiff was having an excellent response to plaintiff's current medication regimen. (Notes of June 29, July 27, August 25, and September 22, 2006). *Id.* at pp.24-30.

On November 16, 2006, a psychiatrist whose name is illegible found that plaintiff had moderate and marked limitations in several areas of her mental function. The report appears to be part of the records of Mental Health Connections, but it is unclear who this psychiatrist is, and whether this psychiatrist was ever a treating psychiatrist.

## DISCUSSION

1.   **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or

SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ...."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that [she] is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; ... .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work.  Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

## 2.   **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final  decision is limited to the determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be

"more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

## 3.    <u>Plaintiff's Right to Counsel</u>

Under the Social Security Act, claimants have a statutory right to notification of their option for obtaining legal representation in relation to both disability insurance and SSI clams. 42 U.S.C. § 406(c). The notification must also inform the claimant of the availability of legal service organizations which provide these services free of charge. *Id.* The regulations contain comparable sections. *See* 20 C.F.R. §§ 404.1706, 416.1506. Once a claimant receives adequate notice of the availability of representation, she may waive her right to counsel either orally or in writing before the ALJ. *See Frank v. Chater*, 924 F. Supp. 416, 423 (E.D.N.Y. 1996). *See also Leonard v. Comm'r of Soc. Sec.*, 05-CV-1084, 2008 U.S. Dist. LEXIS 60900, *18 (N.D.N.Y.

Aug. 7, 2008)(citations omitted).

In this case, plaintiff argues that she was not provided a full and fair hearing because she was not advised of her right for a free attorney prior to the hearing in Utica in March 22, 2006.  Plaintiff argues that she was prejudiced because she did not realize she would be able to seek free counsel in Utica, New York, and that the ALJ did not advise her of that possibility.  Plaintiff argues that the waiver of counsel that she gave to the ALJ is insufficient because she was not properly advised of her right to a free attorney.

In response to this argument, defense counsel attached documents to the defendant's memorandum of law, designed to show that plaintiff was given advice about an attorney while she was still in Puerto Rico, prior to her move to Utica, New York. (Dkt. No. 18).  Defendant attached copies of publications sent to claimants and a declaration by the Hearing Office Director of the Social Security Hearing Office in Syracuse, New York.  Plaintiff argues that the Commissioner is attempting to add new and material evidence to the record, but that this information is not new and not material.  (Dkt. No. 19, 1-2).

While it is true that plaintiff was advised in writing of her right to counsel, the court in *Leonard* found that this notice may not be sufficient in certain circumstances. 2008 U.S. Dist. LEXIS 60900 at *20.  According to the regulations the ALJ must advise the plaintiff that she has the right to a representative. 20 C.F.R. § 404.916 (b)(2).  In *Frank*, the court held that the ALJ erred in failing to provide the claimant an explanation of the benefit of having an attorney; of the availability of free counsel or

14

of obtaining a contingency arrangement; and notification of the availability of statutory attorneys' fees. 924 F. Supp. at 923-24.  The court must note that even if the ALJ does not sufficiently inform the claimant of her rights, the lack of counsel is not enough to justify a remand if the claimant was not prejudiced as a result of the ALJ's error. *Leonard*, 2008 U.S. Dist. LEXIS 60900 at *21-22. (citations omitted).

In this case, the problem was compounded because the claimant does not speak English, even though an interpreter was present.  At the hearing, the ALJ began by reminding plaintiff that she had been advised in writing about the right to a representative and asking plaintiff if there was a reason that she had appeared without any representative. (T. 36).  Unfortunately, as in the rest of the transcript, the plaintiff's answer contains inaudible sections:

> CLMT: I wasn't able to [INAUDIBLE] told me they
> wouldn't take [INAUDIBLE].  I went to a larger private firm
> and they couldn't [INAUDIBLE] since.

(T. 36).  The ALJ then discussed the translation of the records, and the plaintiff made some other statement[8] that made the ALJ return to the issue of representation. (T. 37). The ALJ then stated that the plaintiff had a "choice," and that she could waive her right to representation or the ALJ would give her an adjournment, "and then we'll come back and do the hearing at a later date." (T. 37).  Plaintiff responded that "I don't know.  I think I want to continue it ***or no***." *Id.* (emphasis added).  The ALJ then

---

[8] It is difficult to determine what the plaintiff was referring to because there are inaudible portions to that sentence. (T. 36-37).  Plaintiff stated "I just know that he was putting a [INAUDIBLE].  You probably had it all here [INAUDIBLE]." *Id.*  The plaintiff may have been referring to her former counsel after the ALJ mentioned the translation of the records, however, the court cannot speculate about what the plaintiff stated that made the ALJ return to the subject of representation.

pressed plaintiff for a "definitive answer," and plaintiff stated that she wanted to "be heard today." (T. 37).  The ALJ then continued the hearing. *Id.*

The ALJ did not mention any of the required information regarding free counsel, statutory attorneys' fees, or the availability of a contingency arrangement as stated in *Frank* and *Leonard*.  It was clear that plaintiff had attempted to find counsel at a "larger firm," but that the firm apparently could not take the case.  While it is true that plaintiff obtained the written notification that she had the right to an attorney, and she did have a prior attorney in Puerto Rico, the ALJ certainly did not inquire very carefully about plaintiff's desire to proceed without representation, and it is unclear whether plaintiff knowingly waived her right to have a representative.

As stated above, the ALJ's error alone might not justify a remand if the plaintiff was not prejudiced by the lack of representation.  However, in this case, this court finds that plaintiff was prejudiced by the lack of counsel.  As discussed below, the transcript is completely inadequate for the court to properly review this action, and while an attorney may not have been able to avoid inaudible sections of the tape, he or she could have addressed the issue before the appeals council.  Additionally, the ALJ was unable to obtain plaintiff's more current[9] medical records, and a proper representative could have assisted the ALJ in obtaining the medical records.  Those records would have assisted the ALJ in making her decision.  Since this court is recommending remand for various inadequacies, the failure of the ALJ to properly inform plaintiff of her right to representation is additional support for remand.

---

[9] The ALJ was referring to the medical records from doctors in Utica that were written after plaintiff moved from Puerto Rico to Utica, New York.

16

4.    **Duty to Develop the Record**

Because an administrative hearing regarding disability benefits is "non-adversarial," the ALJ has an affirmative duty to develop the record. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). That duty is heightened when the claimant is *pro se*. *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990). This affirmative duty consists of assisting the *pro se* claimant in developing his or her case. *Id.* (quoting *Eiden v. Sec. of Health, Educ. & Welfare*, 616 F.2d 63, 65 (2d Cir. 1980)).

A.    **Hearing Transcript**

One glaring problem in this case is the completeness of the transcript of the hearing before the ALJ. (T. 35-46). From the very beginning, there were difficulties in recording the hearing since the hearing was held in Utica and the recording was apparently being done in Syracuse. (T. 35, 36). The hearing assistant immediately had difficulty hearing all of the testimony, and this apparently continued throughout the hearing, perhaps unbeknownst to the ALJ. The transcript has dozens of "(INAUDIBLE)" sections, and it is unclear whether the missing inaudible portions are simply one word or phrases or sentences. On page 38, there are five or more answers from the claimant which are inaudible, and the pages following are very similar, with some pages containing as many as eight inaudible entries (T. 240), and others containing five, six, or even ten inaudible entries (T. 40-45).

Although the Commissioner argues that only single words were missing from the transcript, this court does not believe that to be the case. An example is when the ALJ was questioning plaintiff about her daily activities. (T. 46-47). There are many

17

inaudible sections, and then the ALJ asks why plaintiff was "spending time locked in [her] room." (T. 46). There is no reference in the transcript about plaintiff spending time locked in her room, thus, this discussion may have been during one of the "inaudible" sections. The ALJ also asked plaintiff about her "nervousness" and how that affected her ability to work. (T. 45). Plaintiff stated that "I can't be next to somebody and [inaudible]." *Id.* The ALJ never followed up on the question, and the court cannot determine what plaintiff was attempting to state.

There are significant sections of answers from the plaintiff that are mostly or totally inaudible, and this court cannot adequately review plaintiff's testimony based on the quality of the transcript produced from the hearing. While the ALJ may have heard plaintiff's testimony, the transcript of that testimony is insufficient and does not allow for an accurate review by this court.

### B.   Medical Records

At the hearing the ALJ told plaintiff that the ALJ was going to attempt to obtain plaintiff's more current medical records. (T. 38-39). Although there are letters in the record showing that the ALJ made an attempt to write to plaintiff's medical providers, the ALJ never followed up when the providers apparently failed to send records.[10] In *Cruz v. Sullivan*, the Second Circuit stated that while the requirement to obtain treating source evidence is couched in terms of "every reasonable effort," the Social Security Ruling states that if the treating source records are necessary to resolve an

---

[10] Clearly, there were records available since plaintiff has submitted records that date back to November of 2005, and the ALJ's letters were written after the March 22, 2006 administrative hearing.

inconsistency between the treating source and other sources, "the adjudicator *will*
secure additional evidence and interpretation or explanation from the treating
source(s) and/or consulting source(s)." 912 F.2d at 12 (citation omitted).  In *Cruz*, the
court held that based on the record in that case, the language required "something
more than simply sending a letter." *Id.*

 This court finds that the ALJ erred in this case by simply sending a letter to the
plaintiff's treating sources.  The combination of plaintiff's move to Utica from Puerto
Rico, her inability to speak English, the ALJ's statement that she would obtain the
current medical records, and the fact, as discussed more fully below, that the ALJ used
non-examining sources to determine that plaintiff could perform "medium" work,
when there was no support in the treating sources' reports, supports this court's
finding that the ALJ did not fully and fairly develop the record in this plaintiff's case.

**6.** **Residual Functional Capacity**

 In rendering a residual functional capacity (RFC) determination, the ALJ must
consider objective medical facts, diagnoses and medical opinions based on such facts,
as well as a plaintiff's subjective symptoms, including pain and descriptions of other
limitations. 20 C.F.R §§ 404.1545; 416.945. *See Martona v. Apfel*, 70 F. Supp. 2d 145
(N.D.N.Y. 1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).
An ALJ must specify the functions plaintiff is capable of performing, and may not
simply make conclusory statements regarding a plaintiff's capacities.  *Verginio v.
Apfel*, 1998 WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at
183.

In this case, plaintiff argues that the ALJ erred in finding that plaintiff was capable of medium work with the physical ability to lift fifty pounds occasionally, and twenty-five pounds frequently. The ALJ based that finding on a RFC assessment prepared in September 2004 by Dr. Garcia and another non-examining physician. (T. 435-43). That assessment was based on a review of records, and not prepared by any of plaintiff's treating physicians. The ALJ specifically stated that the "only assessments of record are from review physicians and a consultative examiner." (T. 31). The ALJ stated that "[t]his evidence is not rebutted by any treating source even though the undersigned tried to get treating source evidence." (T. 31).

In determining that plaintiff could perform medium work, including the ability to lift fifty pounds, as support for the non-examining physician's opinion, the ALJ cited a report by consulting physician Dr. Frances Nazario. (T. 31). Dr. Nazario found that plaintiff's prognosis was "guarded" and found that plaintiff had a "moderate physical disability for lifting objects, carrying objects, pushing, and pulling due to the limitation of range of motion due to [degenerative joint disease]." (T. 426). It is unclear how this opinion supports a finding that plaintiff can lift *fifty* pounds. Since the ALJ was obligated to develop the record and to contact plaintiff's treating sources, the ALJ's determination that plaintiff could do medium work during the period in question, based on such inconsistent evidence is not supported by substantial evidence.

### 7.   Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the

objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'"  *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...."  20 C.F.R. § 404.1529(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication

taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

Plaintiff argues that the ALJ pointed to a missed appointment with Mental Health Connections as a factor in assessing plaintiff's credibility. There is ***no*** evidence in the record to support the ALJ's statement that plaintiff missed an appointment. In support of this finding, the ALJ cites "(Exhibit 10F)." (T. 31). Exhibit 10F is the ALJ's letter to Mental Health Connections, requesting information about plaintiff, attaching a mental RFC questionnaire. (T. 465-68). This exhibit has absolutely nothing to do with plaintiff failing to attend an appointment. Thus, the ALJ's rejection of plaintiff's credibility based on this alleged failure is not supported by substantial evidence.[11]

If the ALJ based her assessment of credibility on plaintiff's testimony, that presents a major problem since plaintiff's testimony is incomplete and the transcript is full of gaps. This court, therefore, cannot assess whether the ALJ's credibility finding is supported by substantial evidence in the record since the testimony has many gaps and is incomplete. Since this court cannot assess the ALJ's finding of credibility, a remand is necessary.

---

[11] In fact, the ALJ's assessment based on plaintiff's alleged failure to attend an appointment is directly contradicted by the evidence submitted by plaintiff's counsel showing frequent visits to Mental Health Connections during 2006. (Dkt. No. 14, attached pp.20-30).

**8.**   <u>**New and Material Evidence**</u>

Plaintiff's 2005 and 2006 records were not part of the transcript because the ALJ failed to obtain them.  The Social Security Act provides that a court may ***remand*** a case to the Commissioner to consider additional evidence, but only if the evidence is new, material, and there is good cause for failure to incorporate that evidence into a prior proceeding. 42 U.S.C. § 405(g) (sentence six).

The Second Circuit has developed a three-part test showing what is required to support a sentence six remand.  *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988). First, the evidence must be "new" and not merely cumulative of what is already in the record.  *Id.* (citing *Szubak v. Secretary of Health & Human Services*, 745 F.2d 831, 833 (3d Cir. 1984)).  Second, in order for the new evidence to be "material," it must be both relevant to the claimant's condition during the time period for which benefits were denied and probative."  *Id.* (citing *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975)).  The Second Circuit has also held that the concept of "materiality" requires a finding that there is a reasonable possibility that the new evidence would have influenced the Commissioner to decide the claimant's application differently. *See Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991).  Third, the plaintiff must show that there is good cause for failing to present the evidence earlier.  *Lisa v. Secretary of the Dep't of Health & Human Services*, 940 F.2d 40, 43 (2d Cir. 1991) (quoting *Tirado*, 842 F.2d at 597).

Since this court is recommending remand for further development of the record, including the additional evidence from plaintiff's treating physicians, the court does

23

not need to assess whether the records submitted by plaintiff constitute "new and material evidence" for purposes of a remand under sentence six of section 405(g). The records in question may be considered in the further development of the record because if the ALJ had properly developed the record, they would have been included and considered initially.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be **REVERSED**, and this case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with the above Report.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 23, 2009

Hon. Gustave J. DiBianco
U.S. Magistrate Judge

24